SO ORDERED.

SIGNED this 20th day of May, 2021.



Mitchell L. Herren
United States Bankruptcy Judge

---

**DESIGNATED FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

IN RE:

MONICA L. BAKER

              Debtor.

    Case No. 19-12015
    Chapter 7

L. JOY DAVIS

              Plaintiff,

vs.

MONICA L. BAKER

              Defendant.

    Adv. No. 20-5006

## <u>MEMORANDUM OPINION</u>

Section 727 objections to a Chapter 7 debtor's discharge are difficult to

prove, and for good reason. A denial of debtor's discharge is the "death

penalty" in bankruptcy. A creditor's objections to discharge under § 727(a)(2) and § 727(a)(4)(A) and (D)—based upon the debtor's singular failure to disclose a "customer list" from her accounting business on Schedule A/B— require proof that the debtor concealed the customer list with the intent to hinder, delay, or defraud a creditor or the trustee, knowingly and fraudulently made a false oath, or knowingly and fraudulently withheld recorded information from the Chapter 7 trustee. Fraudulent intent is an element of each of those objections. While fraudulent intent can be shown by circumstantial evidence, the plaintiff's evidence of such was lacking or unpersuasive in this case. Having failed to meet her burden of proof on any of the objections, the plaintiff's § 727(a) claims must be denied.[1]

Jurisdiction

A proceeding objecting to a Chapter 7 debtor's discharge under § 727 is a core proceeding arising under the Bankruptcy Code, 28 U.S.C. § 157(b)(2)(J), for which the bankruptcy court has subject matter jurisdiction.[2]

Findings of Fact

*Background and Sale of Accounting Business*

---

[1] The plaintiff L. Joy Davis appeared by her attorney Joshua VC Nicolay. The defendant-debtor Monica L. Baker appeared by her attorney Cody R. Smith.

[2] *See* 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Kansas District Court's amended standing order of reference, S.O. 13-1 incorporated in D. Kan. Rule 83.8.5 set forth in the United States District Court, District of Kansas *Rules of Practice and Procedure for District and Bankruptcy Court* (March 17, 2021).

2

Debtor-defendant Monica Baker is the sole proprietor of Baker Professional Accounting Services. She is indebted to plaintiff Joy Davis pursuant to a state court consent judgment arising out of her breach of contract for the purchase of an accounting business. In the latter part of 2014 plaintiff Davis sold her accounting business (Kahmeyer Accounting) to defendant Baker, a ten-year employee of the business, for a purchase price of $255,031, of which $245,031 was allocated for tax purposes to the "client base." The parties memorialized the transaction by a Business Sale Agreement dated November 1, 2014.[3] Neither party was represented by an attorney in the negotiation or sale of the business.

Neither party is a certified public accountant. At the time of the sale, Davis was a part-time school teacher and worked part-time at the accounting business, but was planning to retire. Baker worked full-time at the business and had been employed there for about ten years. Baker maintained that she was the one who "cultivated" the clients. She held herself out as a public accountant. The business provided state and federal income tax preparation services, sales tax returns, monthly payroll services, preparation of profit and loss statements and depreciation schedules, and performed general bookkeeping functions for some clients.

---

[3] Trial Ex. 1.

When Davis had the business, she did not maintain a client list. She acknowledged that an accounting business has no "customers;" the people to whom they provide accounting services are properly referred to as "clients." When Davis acquired the business from her predecessor in 1986, she had client files, generated manually. Over time the business transitioned to databases of client information and their historical data generated and accessed through computer software programs. The "Client Base" referenced in the sale contract was this database and historical client information and records. According to Davis, this was the most valuable asset of the business that was transferred to Baker. Baker counters that the value of the business lies in the value of services performed for the client. Though Davis planned to retire, Baker sought and the parties agreed to a non-compete provision in the contract that prohibited Davis from competing with Baker for a five-year period in a 50-mile radius. This non-compete provision is what made the client base valuable according to Baker. Since the sale, Baker has operated the accounting business as a sole proprietorship, dba Baker Professional Accounting Services (BPAS).

After paying some $60,000 toward the sale contract, Baker defaulted in her payments under the contract and Davis sued her in Pratt County District Court for breach of contract. The parties ultimately settled the dispute in the fall of 2019 and entered into a consent judgment against Baker in the amount

4

of $174,516.[4] Neither the sale transaction, nor the consent judgment was secured or collateralized in any fashion.

*The Bankruptcy Filing and Objection to Discharge*

Baker filed a Chapter 7 bankruptcy on October 21, 2019. Davis filed an unsecured proof of claim in the bankruptcy case based on her state court judgment. Debtor disclosed in her bankruptcy petition that she was the sole proprietor of BPAS and listed its EIN.[5] She also listed her ownership interest in BPAS on the Statement of Financial Affairs (SOFA) and represented that her accounting business was the primary source of her income.[6] On Schedule A/B, Baker listed her accounting licenses and the business website or internet domain name (with $0 value).[7] In Part 5, she scheduled her business-related property:[8] accounts receivable of $9,000 (line 38) and "computers, printers, copiers, software, other office equipment" of $6,830 (line 39). Baker represented she had no "customer lists, mailing lists, or other compilations" (line 43), nor any other business-related property (line 44). On Schedule G, Baker listed a copier lease, an office lease, and an IT service agreement, all of which she intended to assume.[9] She disclosed Davis' lawsuit

---

[4] Trial Ex. 7.
[5] Doc. 1, p. 2, line 4 and p. 4, line 12.
[6] Doc. 1, pp. 31-32.
[7] Doc. 1, p. 14, lines 26 and 27.
[8] Doc. 1, pp. 15-16.
[9] Doc. 1, p. 24 and pp. 38-39

**5**

for breach of contract in Part 4 of her SOFA.[10]

Baker contends that she checked the "no" box on line 43 because she has no "customer list." And without a non-compete agreement, she believed the client list had no value. In a Chapter 7 liquidation, the client list or client database, if sold, would be free of a non-compete clause.

Davis commenced this adversary proceeding on January 20, 2020, objecting to Baker's discharge under § 727(a)(2) and § 727(a)(4)(A) and (D). This proceeding boils down to the issue of whether Baker's discharge should be denied for failing to disclose the existence of a "customer list" on line 43 of Schedule A/B. During the pendency of this proceeding, plaintiff's complaint evolved from omission of the "customer list" (frequently equating a customer list to a client list by reference to the "customer/client list") as alleged in the complaint,[11] and "client list" as alleged in the amended complaint,[12] to failure to list her "customer/client list and appurtenant [client] databases" as contended in the final pretrial order,[13] to asserting through her expert witness at trial that the client base was a "compilation" within the meaning of line 43. Though the Court does not view a customer list and a client list as interchangeable terms, nor equate a database to a customer list or compilation, the Court need not delve into the distinctions to decide this case. Even if the client list, client base, or database should have been disclosed

---

[10] Doc. 1, p. 33.
[11] Adv. Doc. 1.
[12] Adv. Doc. 13.
[13] Adv. Doc. 50, p. 3, 7-11.

**6**

on Schedule A/B, plaintiff must show that Baker omitted the same with the intent to hinder, delay or defraud creditors or "knowingly and fraudulently" omitted them. As discussed below, this is where plaintiff's § 727(a) claims fail.

*Administration of the Bankruptcy Case[14]*

Following the debtor's § 341 meeting, the Chapter 7 trustee filed a notice of assets and moved for turnover of BPAS receivables, among other enumerated property.[15] That motion was granted without opposition, and was later amended by agreement.[16]

The trustee filed his final report on October 29, 2020, and an order of distribution was entered November 24, 2020.[17] No party objected to the trustee's final report or proposed distribution. Baker's accounting license and website were listed as assets of the estate, but had no value. The trustee administered assets having a total value of $17,677.66 and collected a total of $16,360.91, of which $7,978 was attributed to BPAS's accounts receivable. The office equipment was exempt as tools of the trade and its value was under the $7,500 exemption limit provided by Kansas law. Nearly $10,000 of the trustee's receipts were available for distribution to general unsecured creditors with Davis to be paid the lion's share of that distribution on her

---

[14] The Court takes judicial notice of the proceedings that occurred in the trustee's administration of debtor's bankruptcy case.
[15] Doc. 22.
[16] Doc. 37, 58, and 60.
[17] Doc. 68, 70.

7

allowed claim.

At trial, the Chapter 7 trustee testified that he was aware of the Davis-Baker adversary proceeding and the claims for denial of discharge. He did not agree with the complaint and stated that he had no grounds to bring a § 727 complaint.

The trustee was aware debtor was an accountant and operated her business as a sole proprietorship. In his view, the debtor adequately disclosed she had a client base. He investigated and sought turnover of the accounts receivable, the main source of funds for the estate, and non-exempt, collectible tangible assets. The trustee requested an itemization of the receivables and corresponding invoices and debtor complied with his requests for information. Pursuant to an agreed turnover order, debtor in fact paid the receivables and value of other tangible property.  In short, the debtor cooperated with the trustee and did not hide or conceal property of the estate. Nor did she impede the trustee's ability to administer the case.

In his 37 years serving as a trustee, Mr. Morris believed that trying to ascertain the value of intangibles like a client list or client database serves no purpose other than to sell the accounting practice. And where the debtor is operating the business as a "dba" (sole proprietorship), there is a limited purchaser base or readily available market for such property. In the trustee's view, disclosure of the client list or database would not have resulted in a

8

greater recovery or changed anything he did. Pursuing a "sale" of the client database could put the debtor out of business and was impractical and counter-productive to collecting the tangible assets for the estate. Thus, the trustee never sought turnover of the client list or database.

*The Experts*

Much of the expert testimony in this case focused on the value of an accounting practice's client list or client base. Each of the party's experts submitted a report.[18] Neither expert directly addressed the fact that the value allocated to the client base in the Business Sale Agreement was "for tax purposes."

Eric Gates testified as an expert witness on behalf of the plaintiff. Mr. Gates is not a certified public accountant and has no formal education or training in business valuation. His educational background and training were in nuclear engineering and technology. Gates holds a senior tax preparer certificate through H&R Block.

Upon returning to Kansas, he bought his father's insurance business, converted his father's tax preparation and bookkeeping business to a H&R Block franchise and acquired seven more franchises in other small Kansas communities (either by purchasing the franchise or an independent

---

[18] Trial Ex. 11 (Plaintiff's expert Eric Gates) and Trial Ex. G (Defendant's expert Cathy L. Mitchell).

accounting business).  Gates negotiated the purchase of all the franchises or accounting businesses. His opinions are based on his experience in acquiring accounting businesses and franchises.

Gates opined that the client list was the most valuable asset of the tax preparation and bookkeeping business being acquired. Under the franchise agreements, the franchisor owns the client list and goodwill of all franchises. Franchisees like Gates must sign a noncompete agreement and he loses access to the client base if he is no longer a franchisee. He acknowledged that a noncompete was important in valuing the client list as it provides assurance that clients stay with the new franchisee instead of the previous, selling owner.  It was his practice to obtain a noncompete agreement when acquiring independent accounting businesses. In the two accounting businesses he purchased, he obtained a noncompete agreement from the owner as part of the sale transaction in one, and in the second, he did not need a noncompete agreement because the owner of the business was deceased and he was acquiring the business from the decedent's estate. He opined that a client list by itself, has some value bearing on the total value of a business, though he conceded he would not purchase an accounting business without transfer and sole possession of the client list and a noncompete agreement.

**10**

Though Gates opined that the client list encompassed databases developed by the business and constituted a "compilation," and it was "the most significant asset" of the business, he could not place a value on the BPAS client list because he lacked sufficient information, including its historical and forecasted revenue generated from the client list, goodwill, and the likelihood that clients would be retained in the future.[19]

Cathy Mitchell testified as a rebuttal expert witness on behalf of the defendant. Ms. Mitchell is a certified public accountant and a Vice-President of tax services at the public accounting firm Allen Gibbs & Houlik, L.C. in Wichita, Kansas, and has earned the American Institute of Certified Public Accountants (AICPA) accreditation in business valuation (ABV). Business valuations comprise ninety-five percent of her work. She has reviewed or prepared over 400 business valuations since 2010 and has been a CPA for over 33 years.

Ms. Mitchell addressed Mr. Gates' opinions seriatim. She disputed Gates' opinion that a "customer list" (line 43) and a client list are synonymous and interchangeable. A customer purchases goods and services "as is" from a company while a client seeks professional and specifically tailored services from a company, and in general implies an ongoing, closer

---

[19] Trial Ex. 11, p. 3.

relationship.

Mitchell agreed that a client list can be sold to a third party but opined that a client list sold without a noncompete agreement with the previous provider, has no value. According to Mitchell, a noncompete agreement is even more critical in "client industry" businesses.

Mitchell reviewed the Business Sale Agreement sale price and testified in detail how the accounting business was, in her opinion, overvalued by nearly double, due to an "extraordinarily high" sales multiplier applied to the business revenue figure. Further, Baker was unlikely to generate sufficient cash flow to ever make the annual payments under the Business Sale Agreement. Had Baker financed this transaction through a bank, a cash flow analysis would have been performed and Baker probably would not have purchased Davis's accounting business, at least not at $255,031. This is consistent with Baker's testimony that the Small Business Administration and other lenders told her the business was overvalued. This testimony from Mitchell about the value of the business was unrebutted.

Finally, Mitchell opined that the value of the intangibles in the Business Sale Agreement was more likely attributable to "personal goodwill" transferred from Davis to Baker by the noncompete provision, not to the client list or client base.

**12**

Analysis[20]

A.     Section 727(a) claims in general

The party objecting to debtor's discharge has the burden of proving by a preponderance of the evidence the grounds for denial of discharge under § 727(a).[21] Where fraudulent intent is required, the plaintiff must prove actual intent to defraud creditors, but it may be established by circumstantial evidence, or by inferences drawn from a course of conduct.[22] Here, plaintiff's § 727(a)(2) claim requires proof that the debtor acted with intent to hinder, delay, or defraud a creditor or the trustee. Plaintiff's § 727(a)(4) claims require proof that debtor acted "knowingly and fraudulently."

The legal standards for a denial of discharge are high because it is considered the "death penalty" in bankruptcy.[23] As stated in *In re Peeples,* "[t]he reason for denying a discharge to a bankrupt must be real and

---

[20] The Court notes that at the close of plaintiff's case-in-chief, defendant moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52(a). Though counsel announced his motion was made under subsection (a), subsection (c) is the appropriate Rule reference. Rule 52(c) is made applicable to adversary proceedings by Fed. R. Bankr. P. 7052. The Court denied the motion at that time, directing the defendant to proceed with her case. In light of the Court's decision today, the Rule 52(c) motion for judgment on partial findings is moot.

[21] *Mathai, et al v. Warren (In re Warren)*, 512 F.3d 1241, 1249  (10th Cir. 2008) (citing *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1292 (10th Cir. 1997)); *In re Gordon,* 526 B.R. 376 (10th Cir. BAP 2015**).**

[22] *In re Warren,* 512 F.3d 1241, 1249.

[23] *In re Leone,* 463 B.R. 229, 248 (Bankr. N.D. N.Y. 2011) (describing a denial of discharge as the "death penalty of bankruptcy"); *In re Wells,*  426 B.R. 579, 611 (Bankr. N.D. Tex. 2006) (declining to impose the "death penalty in bankruptcy").

13

substantial, not merely technical and conjectural."[24] The Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor.[25] Even if the creditor satisfies her burden of proof under one of the § 727(a) subsections, the court retains discretion to grant or deny a discharge.[26]

### B. Section 727(a)(2) – fraudulent concealment of customer list

The objective of § 727(a)(2) is to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of his assets.[27] Davis's claim is based on debtor's alleged concealment of the customer list, by omitting it from Schedule A/B, line 43. It is not based upon any fraudulent transfer or conveyance of assets to conceal or hide assets, the typical § 727(a)(2) case. The plaintiff must show that the debtor omitted the customer list "with the intent to hinder, delay, or defraud a creditor."[28] There are two subparts to § 727(a)(2): subpart (A) pertains to prepetition

---

[24] *Lee v. Peeples (In re Peeples),* No. 18-4124, 779 F. App'x 561, 567 (10th Cir. 2019), quoting *Jones v. Gertz*, 121 F.2d 782, 784 (10th Cir. 1941). *See also Korrub v. Cohn ( In re Cohn),* 561 B.R. 476, 492 (Bankr. N.D. Ill. 2016) (stating that denial of discharge is reserved only for the worst actors); *Haupt v. Belonzi ( In re Belonzi),* 476 B.R. 899, 904 (Bankr. W.D. Pa. 2012) ("Completely denying a debtor his discharge ... is an extreme step and should not be taken lightly.") (alteration and internal quotation marks omitted).

[25] *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1292 (10th Cir. 1997).

[26] *See e.g. In re Garland,* 417 B.R. 805, 810 (10th Cir. BAP 2009) (citing 4 Norton Bankr. L. & Prac. 3d § 86:1 (2009)); *In re DiGesualdo,* 463 B.R. 503, 523-25 (Bankr. D. Colo. 2011); *In re Bane*, 426 B.R. 152, 161-62 (Bankr. W.D. Pa. 2010), *aff'd In re Bane,* 2010 WL 11693611 (W.D. Pa. Aug. 5, 2010; *In re Tauber*, 349 B.R. 540, 546 (Bankr. N.D. Ind. 2006); *In re Hacker*, 90 B.R. 994, 997-98 (Bankr. W.D. Mo. 1987). *See also Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) (citing *Hacker*).

[27] *Cook v. Knight (Matter of Knight),* 574 B.R. 800, 813 (Bankr. N.D. Ga. 2017).

[28] *In re Brown,* 108 F.3d 1290, 1292; *In re Warren,* 512 F.3d 1241, 1249.

14

concealment of property in the year prior to filing, and subpart (B) pertains to post-petition concealment of property of the estate. The Court need not identify if this is a prepetition or postpetition concealment, because it finds no fraudulent concealment of the customer list based on the facts and applicable law.

The Kansas bankruptcy court addressed the purpose of § 727(a)(2) in *In re Osborne*.[29] In that case, the trustee alleged in part that debtor violated § 727(a)(2) and § 727(a)(4)(A) by failing to list his interests in real property in his schedules. Quoting a bankruptcy commentator, the *Osborne* court noted that § 727(a)(2) "incorporates a portion of the law of fraudulent conveyances into the realm of discharge issues."[30] The courts commonly consider the presence or absence of the common law badges of fraud from which fraud may be inferred. The *Osborne* court concluded that "concealment through omissions from the [SOFA] and schedules" is covered by the false oath statute, not § 727(a)(2).[31] Concluding that the trustee presented no evidence

---

[29] *Davis v. Osborne (In re Osborne),* 476 B.R. 284, 293 (Bankr. D. Kan. 2012) (holding that omissions on bankruptcy schedules and SOFA may provide a basis to deny discharge on false oath theory, but not on a § 727(a)(2) "fraudulent concealment" theory).

[30] *Id.* at 293 (quoting 4 *Norton Bankruptcy L. & Prac.,* § 86.4 (3rd ed. 2012) (online database updated July 2012)). *See also In re Stewart, infra* at *3 (noting that courts consider the presence of badges of fraud from which a court may infer fraudulent intent); *In re Brown,* 108 F.3d 1290, 1293-94 (reversing lower courts' denial of discharge under § 727(a)(2) based on inference of fraudulent intent from the badges of fraud).

[31] *See also Wieland v. Gordon (In re Gordon),* 526 B.R. 376, 388 (10th Cir. BAP 2015) (recognizing that the conduct in support of a § 727(a)(2) claim "would ordinarily be different" from conduct to support a § 727(a)(4) claim).

15

from which the court could find fraudulent transfers or dispositions of property, the court denied the § 727(a)(2) claim.

To be sure, a § 727(a)(2) fraudulent concealment claim is typically shown by a transfer of title to property coupled with the debtor's retention of possession and exercising ownership rights in the property.[32] In *Gordon,* for example, the attorney- and CPA-debtor placed legal title to the marital home and motor vehicles in his unemployed wife while retaining an undisclosed beneficial use of the property and continued to treat it as his own.[33] The court in *In re Brown* considered these badges of fraud and factors for a § 727(a)(2) claim: (1) a transfer of property occurred shortly before filing bankruptcy; (2) the purpose of the transfer; (3) debtor continued to possess and use the property after the transfer; (4) unexplained differences in valuation of assets reported on prepetition financial statements and bankruptcy schedules; and (5) failure to list an asset on bankruptcy schedules.[34] On their face, consideration of most of the badges of fraud are ill-suited for inferring fraud

---

[32] *See In re Gordon,* 526 B.R. 376, 388-89 (noting that § 727(a)(2) targets asset transfers in the year prior to bankruptcy and also transfers made more than a year prior to bankruptcy that are concealed by the debtor within one year prior to filing); *United States Trustee v. Garland* (*In re Garland),*417 B.R. 805 (10th Cir. BAP 2009) (debtor who retained an undisclosed beneficial interest in home where he lived, without interruption, for more than two decades denied discharge under § 727(a)(4)).

[33] *In re Gordon,* 526 B.R.at 388-89 (recognizing continuous concealment doctrine).

[34] *In re Brown,* 108 F.3d 1290, 1293-94 (reversing bankruptcy court's denial of discharge under § 727(a)(2) for granting a security interest in an automobile days before filing bankruptcy and clear error in finding that debtor intended to hinder, delay or defraud creditors).

16

where there has been no transfer or conveyance of property.

In a case where there is no transfer or disposition of property, courts have separately defined a concealment claim under § 727(a)(2) as preventing discovery or withholding knowledge or information required by law to be made known, with the intent to hinder, delay or defraud creditors.[35]

In a case with similar facts to this dispute, the Tenth Circuit Bankruptcy Appellate Panel (BAP) affirmed in an unpublished opinion the bankruptcy court's rejection of § 727(a)(2) claims brought against former certified public accountants in the Geyer accounting firm who breached a non-compete agreement.[36] The two individual accountants and their newly formed accounting firm all filed Chapter 7 petitions. Geyer objected to the individual accountants' discharges under § 727(a)(2) and (a)(7), claiming the individual debtors caused their new accounting firm to omit the intangible goodwill and client list from the accounting firm's schedules and caused the firm to transfer those assets post-petition to a newly formed professional corporation. The sole issue on appeal was whether the individual debtors

---

[35] *See e.g. Buckeye Retirement Co., LLC, LTD v. Swegan, (In re Swegan),* 383 B.R. 646, 654-55 (6th Cir. BAP 2008); *Peterson v. Scott (In re Scott),* 172 F.3d 959, 967 (7th Cir. 1999); *Panda Herbal Int'l, Inc. v. Luby (In re Luby),* 438 B.R. 817 (Bankr. E.D. Pa. 2010) (finding concealment sufficient to deny discharge where debtors altered computer files rendering customer lists unrecoverable and unreadable, failed to disclose various assets, failed to keep financial statements, and failed to file tax returns).

[36] *Geyer & Associates CPA's, P.C. v. Stewart (In re Stewart),* 2009 WL 3724977, 421 B.R. 603 (Table) (10th Cir. BAP 2009) (unpublished).

17

committed any of the acts proscribed in § 727(a)(2). With respect to the omission of the client list, the individuals didn't schedule the client list as an asset on the firm's schedules because it was not valuable by itself, with one of the debtor accountants explaining:

> . . . it is the level of service [the accountant] provides that generates income, not the client list. The PC's clients can retain another accounting firm at any time and are under no obligation to employ the PC. As far as he and Stewart were concerned, the client list was as valuable as a list of names from the Yellow Pages. The bankruptcy court found Debtors' explanation regarding the omission of the client list on the PC's schedule credible and agreed that the "client list does not have intrinsic value separate from the services provided by the professional practice." Moreover, this conclusion is supported by the testimony of the PC's trustee, as well as the testimony of Geyer's own representative who admitted there was no value in a client list without a non-compete agreement. Accordingly, the bankruptcy court did not clearly err in holding that "[it] cannot find that the failure to list such assets betrays an intent to hinder, delay or defraud the trustee."[37]

This case demands the same result. Similar to the accountants in *Stewart,* debtor Baker credibly testified that a client list had no value by itself and without a non-compete agreement. That testimony was buttressed by both the debtor's accounting expert and the Chapter 7 trustee. The trustee agreed that the list had no value and would be difficult to sell to a third party to benefit unsecured creditors. This would especially be true if the debtor was not planning to cease or sell her practice, which was the case here.

---

[37] 2009 WL 3724977, at *3.

The trustee testified that he saw no grounds for a § 727 action. He knew the debtor had a sole proprietorship accounting business, that the only thing he might possibly do with information such as a client list would be to try to sell it or the business, but that would be of no practical value to the estate since the debtor could not be forced to sell her business. If such a sales effort did not drive the debtor out of business, she could simply continue operating with her existing clients, making the selling of a "customer/client list" nearly or actually worthless in light of her continued operation and relationship with her clients.

The debtor's expert opined that the client list or database had no value without a non-compete agreement. The value lies in the personal services provided by the accountant to those clients. Moreover, the assets disclosed by debtor—her interest in the accounting business, office equipment and furniture, accounts receivable, and the accounting business internet domain name—belies any fraudulent intent to conceal a client list or hinder, delay, or defraud creditors or the trustee.[38]

The listing of all the other assets of the accounting business would lead a rational person to conclude that debtor had clients to whom she provided accounting services and from which she generated her income. In particular,

---

[38] *See also Cook v. Knight (In re Knight),* 574 B.R. 800, (Bankr. N.D. Ga. 2017).

it is incomprehensible that this plaintiff-creditor, the former owner of the accounting business with knowledge of its clients, could be defrauded by debtor's failing to disclose the existence of a client list. I cannot conclude that debtor's singular omission of a "customer list" from her schedules provides a sufficient factual predicate for an inference of fraudulent concealment from any creditor or the trustee that warrants a denial of her discharge. Plaintiff's § 727(a)(2) claim is denied.

      C.     Section 727(a)(4)(A) – knowingly and fraudulently making a false <u>oath relating to a material fact</u>

Plaintiff's false oath claim may be the strongest of her § 727(a) objections to discharge. But even on this claim, plaintiff cannot overcome the proof hurdle. The purpose underlying a denial of discharge based upon a debtor's false oath is "to ensure complete disclosure by a debtor, which is essential to the efficient function of the Bankruptcy system."[39]

The plaintiff must prove by a preponderance of the evidence that the debtor knowingly and fraudulently made a false oath that relates to a material fact.[40] The omission of assets from schedules may constitute a false oath.[41]

---

[39] *Cook v. Knight (In re Knight),* 574 B.R. 800, 815 (Bankr. N.D. Ga. 2017) (citing *In re Matus*, 303 B.R. 660, 675-76 (Bankr. N.D. Ga. 2004)) .

[40] *In re Brown,* at 1294.

[41] *Job v. Calder (In re Calder),* 907 F.2d 953, 955 (10th Cir. 1990); *In re Gordon*, 526 B.R. 376, 394-96 (10th Cir. BAP 2015) (citing "overwhelming" number of false statements in his bankruptcy papers).

20

### 1. *"Knowingly and fraudulently"*

A false oath must be made "knowingly and fraudulently." Thus, fraudulent intent is an element of a false oath claim under § 727(a)(4)(A). A false statement that is due to mistake, inadvertence, or honest error is not a basis for denial of discharge.[42]

Here, the debtor did not equate her accounting clients with a "customer list," as contemplated by Schedule A/B, line 43. Even the plaintiff acknowledged that in the accounting field, accountants have clients, not customers, and in her industry the list is referred to as a client list. Debtor listed her interest in the accounting practice and all of the other assets used in the business on Schedule A/B. She further believed that the client list by itself had no value. Debtor did not omit multiple assets from her schedules and the omission of the client list was not detrimental to creditors. At worst, the debtor was mistaken in her belief that disclosure of her client list was not required by Schedule A/B.[43] The record is devoid of evidence of fraudulent intent.

---

[42] *In re Brown*, at 1295 (rejecting finding of knowing and fraudulent false oath from debtor's failure to amend and pattern of non-disclosure).

[43] An omission resulting from an honest but erroneous belief that the information need not be disclosed does not constitute a knowingly false omission. *In re Knight,* 574 B.R. 800, 815 (quoting *Segell v. Letlow (In re Letlow),* 385 B.R. 782, 796 (Bankr. N.D. Ga. 2007)).

21

2. *Materiality*

The false oath must relate to a material fact. The "materiality" of a false oath is not merely the value of omitted assets or detriment to creditors but whether the omission adversely affected the trustee's or creditor's ability to discover other assets, or to fully investigate the debtor's pre-bankruptcy dealings and financial condition.[44]

The case of *In re Knight* is instructive and persuasive on the false oath claim.[45] In that case, debtor and his deceased colleague were co-members of an accounting firm (the LLC). In a prepetition arbitration proceeding, the estate representative of the deceased co-member obtained an arbitration award against debtor and argued that the arbitration award was entitled to preclusive effect. Though most of the discharge claims were brought under § 523 and centered on debtor converting his co-member's client list, the deceased co-member's estate representative also brought claims under § 727(a)(2) and (a)(4)(A). The § 727(a)(2)(A) claim was for alleged prepetition fraudulent transfers of property to family or third parties to conceal or dispose of assets. The debtor was granted summary judgment on that claim

---

[44] *In re Osborne*, 476 B.R. 284, (Bankr. D. Kan. 2012) (quoting 6 Collier's ¶ 727.04); *See also In re Asif,* 455 B.R. 768, 793-95 (Bankr. D. Kan. 2011); *United States Trustee v. Garland (In re Garland),* 417 B.R. 805, 814-15 (10th Cir. BAP 2009) (examining materiality requirement for false oath).
[45] *Cook v. Knight (In re Knight),* 574 B.R. 800 (Bankr. N.D. Ga. 2017).

because the property transferred by debtor was not his own property, nor property of the estate; it was LLC property.

The false oath claim was based on debtor's failure to disclose multiple assets: an office building, interests in three companies, and his client list. Consistent with the materiality standard in *In re Garland,* the *Knight* court described materiality, stating that it is broadly construed as "bear[ing] a relationship to the . . . business transactions or estate, or concern[ing] the discovery of assets, business dealings, or the existence and disposition of his property."[46] Thus, even an asset without value may be material, though whether the asset has value is a factor to consider in determining whether the false oath was made knowingly and with fraudulent intent. The bankruptcy court said this about debtor's omission of his and his co-member's client lists from Schedule B:

> On his Schedule B, the Debtor lists as an asset "Ownership of AWKPHC LLC dba Knight and Cook, CPA's." The Debtor does not list his client list as a separate asset. The Plaintiff takes issue with this, arguing that the client list is a valuable asset that should be listed separately. She also asserts that the Debtor should have listed Cook's client list as an asset because he "took and converted [it]." . . . In support of his motion for summary judgment, the Debtor contends that his scheduling of his interest in the LLC as a whole was sufficient.

> The Court agrees with the Debtor that there was no need for him to schedule his client list separately from his aggregate interest in the LLC. In an instance such as this, disclosure of the

---

[46] *Id.* at 815 (quoting *Chalik v. Moorefield (In re Chalik)*,748 F.2d 616, 618 (11th Cir. 1984)).

whole suffices as disclosure of the parts. The disclosure of the interest in the accounting practice as a whole was sufficient notice to the Trustee and other parties that the Debtor had assets incident to the ownership of an accounting practice. The Plaintiff cites no authority, and the Court is not aware of any, requiring the line-item disclosure she believes the Debtor should have provided.[47]

This reasoning is persuasive where, as here, the debtor's interest in the accounting practice is disclosed, along with related assets such as receivables, office furniture, equipment, and the internet domain name. As the trustee indicated at trial, he was aware of debtor's accounting business and debtor's omission of the "customer list" (to which he ascribed no value) did not inhibit his ability to investigate debtor's financial condition and administer the assets of debtor's accounting practice and the estate. I therefore conclude that debtor's client list was neither "knowingly and fraudulently" omitted, nor related to a material fact. Plaintiff's false oath claim is denied.

D. Section 727(a)(4)(D) – knowingly and fraudulently withholding recorded information from the trustee

This objection to discharge bars a Chapter 7 debtor's discharge if she "knowingly and fraudulently," in or in connection with the case—

withheld from *an officer of the estate* entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;[48]

---

[47] *Id.* at 816.

[48] Section 727(a)(4)(D) (Emphasis added). *See also* § 521(a)(4) (imposing statutory obligation on debtor to provide recorded information to the trustee); *Young v. Young (In re Young),* 346 B.R. 597, 615 (Bankr. E.D.N.Y. 2006) (noting that § 727(a)(4)(D) enforces the debtor's

24

The emphasized language of the statute clearly contemplates that the debtor must have withheld the recorded information from the Chapter 7 trustee. The trustee is the only officer of the estate in this case. The claim fails where, as here, the creditor asserts the objection and there is no evidence that the debtor withheld *any* documents or information from the case trustee.[49] To the contrary, the trustee indicated that the debtor cooperated with him and provided all requested information.

Further, the case law provides that § 727(a)(4)(D) does not apply unless the case trustee requested the information.[50] The evidence was clear from trustee Morris's testimony that he did not specifically request a customer or client list from debtor, though he assumed the debtor had clients. Morris believed that the client list was of little value and that he would be unable to market or realize any proceeds for distribution to creditors by selling the

---

statutory obligation by denying discharge to debtors who intentionally withhold recorded information relating to their property or financial affairs).

[49] *See Blackwell Oil Company, Inc. v. Potts (In re Potts),* 501 B.R. 711,723 (Bankr. D. Colo. 2013) (A creditor is not an officer of the estate for purposes of § 727(a)(4)(D)); *Crowder v. Wilbur (In re Wilbur)*, 574 B.R. 782, 798 (Bankr. N.D. Ga. 2017) (debtor's failing to produce all records requested by creditors for Rule 2004 exam did not state a claim for denial of discharge under § 727(a)(4)(D) absent allegations that debtor withheld any information requested by the trustee); *Pillarella-Bryant v. Bryant (In re Bryant)*, Adv. No. 18-1044-t; No. 18-11348-t7; 2019 WL 2617472, at *6 (Bankr. D. N.M. June 26, 2019) (the claim fails if there is no evidence in the record that debtor withheld any documents from the case trustee); *Williamson v. Asif (In re Asif)*, 455 B.R. 768, 793 (Bankr. D. Kan. 2011) (trustee failed to establish the recorded information relating to property of the estate existed on the petition date).

[50] *White v. White (In re White),* 568 B.R. 894, 913 (Bankr. N.D. Ga. 2017). *See also, Grant v. Sadler (In re Sadler)*, 282 B.R. 254, 264 (Bankr. M.D. Fla. 2002) (plaintiff must present evidence that the trustee requested the information).

25

list.[51] This view was shared by debtor's accounting expert. Apart from that, the debtor fully cooperated with the trustee's administration of the estate. The trustee recovered over $16,000 for the estate's interest in other assets of debtor's accounting practice— receivables, furniture, and equipment. The trustee fully administered debtor's case and was satisfied with the information debtor shared or presented in her schedules and the meeting of creditors.[52] If he was not satisfied, the trustee could have filed this action or joined in Ms. Davis' objection to discharge. The trustee did neither. In short, there is no evidence that the debtor fraudulently withheld the "customer list" from the trustee.

Conclusion

The plaintiff's complaint for denial of discharge under §§ 727(a)(2), 727(a)(4)(A) and (D) is denied. Judgment will be entered this day in favor of defendant on all of the § 727(a) claims and defendant will be granted a discharge.

# # #

---

[51] *See In re Stewart,* 421 B.R. 603, at *3 (Table) (10th Cir. BAP 2009) (principal of debtor accounting firm explaining the failure to separately list the firm's client list because "it was not valuable by itself . . . it is the level of service he provides that generates income, not the client list.").

[52] *See In re Potts,* 501 B.R. 711, 723 (§ 727(a)(4)(D) claim not supported by the evidence where trustee believed that debtor had not withheld any recorded information relating to debtor's property or financial affairs and he was satisfied with the information received from the debtor).

26